IN THE CIRCUIT COURT OF THE
FOURTH JUDICIAL CIRCUIT,
IN AND FOR DUVAL COUNTY, FLORIDA

CASE NO.: ___ 01-007083
DIVISION _____            ·XXXX-MA

JOHN A. GATES,

    Plaintiff,

vs.

# DIVISION CV-B

U.S. AIRWAYS GROUP, INC.,
U.S. AIRWAYS, INC.,
DONOVAN SAADIQ a/k/a
DONOVAN X a/k/a DONOVAN P.
MALOID, a/k/a DONOVAN X. MALOID
a/k/a/ DONOVAN P. XX, & JOHN DOES,

## INJUNCTIVE AND DECLARATORY RELIEF REQUESTED

    Defendants.

## COMPLAINT

COMES NOW, the Plaintiff, John A. Gates, by and through his undersigned

counsel, and for his Complaint against the defendants, U.S. Airways Group, Inc., U.S.

Airways, Inc., Donovan Saadiq a/k/a Donovan X, and those certain other John Does,

states and alleges as follows:

## THE PARTIES

1.    John A. Gates ("Gates") is a resident and citizen of Duval County, Florida,

and sui juris.

2.    Defendants U.S. Airways Group, Inc. and U.S. Airways, Inc. (hereinafter

collectively "U.S. Airways") are incorporated in Delaware with headquarters at 111 West

Rio Salade Parkway, Tempe, Arizona, 85281. U.S. Airways maintains an airline terminal

and substantial business presence at the Jacksonville International Airport in Duval

County, Florida.

3.    Defendant Donovan Saadiq, who identified himself to Gates as U.S. Airways Shift Manager Donovan X ("Saadiq"), was at all times relevant to the events mentioned herein a resident and citizen of Duval County, Florida, sui juris, and an employee and/or agent of U.S. Airways and was acting within the scope of his employment with regard to boarding passengers on U.S. Airways Flight 1618 on June 6, 2007 at the Jacksonville International Airport in Jacksonville, Florida.

4.    Defendant John Does consisted of other U.S. Airways' Desk Agents and employees ("John Does"), as well as the captain of U.S. Airways Flight 1618 ("Captain John Doe"), who were at all times relevant to the events mentioned herein employees and/or agents of U.S. Airways and were acting within the scope of their employment relevant to U.S. Airways Flight 1618 on June 6, 2007 (U.S. Airways, Saadiq, John Does, and Captain John Doe shall sometimes be collectively referred to herein as the "Defendants").

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction of this action pursuant to Florida Statutes § 26.012(2)(a).

6.    The events giving rise to the claims alleged in this Complaint arose at the Jacksonville International Airport. U.S. Airways maintains an airline terminal and substantial business presence at the Jacksonville International Airport in Jacksonville, Florida. Venue in this Court is therefore proper pursuant to Florida Statutes Ch. 47.

7.    All conditions precedent to the bringing of this action by Gates have occurred, or their performance has been waived by Defendants.

GENERAL ALLEGATIONS

8.    Gates is a twenty-six (26) year old male who has been disabled since he was eight (8) years old, by virtue of a neuromuscular disease known as Dystonia.

9.    Dystonia is a neurological movement disorder in which sustained muscle contractions, throughout the body, cause twisting and repetitive movements or abnormal postures.

10.    Gates uses a wheelchair as his primary mode of mobility, but is able to transfer in and out of his wheelchair without assistance, as well as traverse moderate distances without the assistance of a wheelchair or another person.

11.    While Dystonia substantially limits Gates in several major activities of daily living, Gates has lived a productive and rather independent life, obtaining a Bachelor of Arts in Creative Writing from Florida State University and pursuing a career as a writer.

12.    Prior to and including June 6, 2007, Gates lived with his mother, Patsy Gates, who assisted Gates with various activities of daily living.

13.    Prior to and including June 6, 2007, it was discovered that Patsy Gates would require surgeries on both of her knees resulting in the need for a prolonged period of physical rehabilitation and, as a result, Gates would need to travel to Wisconsin to stay with family friends during his mother's rehabilitation.

14.    Patsy Gates' surgery was scheduled for June 8, 2007.

15.     At all times material hereto, U.S. Airways was a common carrier engaged in the business of transporting passengers for hire by aircraft in and to multiple states throughout the United States.

16.     On or about May 20, 2007, Gates and U.S. Airways entered into an agreement whereby Gates purchased a plane ticket to travel from Jacksonville, Florida to Milwaukee, Wisconsin on U.S. Airways Flight 1618 on June 6, 2007. In exchange for passage on U.S. Airways Flight 1618, Gates paid Two Hundred Ninety-Five and 10/100 Dollars ($295.10).

17.     Gates had flown, unaccompanied, from Jacksonville International Airport on seven (7) different occasions with different airline carriers, including U.S. Airways.

18.     In particular, in October 2006, Gates purchased a ticket to fly with U.S. Airways.

19.     Relevant to this particular October 2006 flight, upon arrival at the Jacksonville International Airport, Gates and his mother were questioned by U.S. Airways personnel regarding Gates' ability to fly unaccompanied with his disability.

20.     After a thorough telephone investigation by a nurse employed by U.S. Airways, Gates was allowed to fly unaccompanied.

21.     Gates and his mother were told by the nurse that on subsequent flights he should inform the flight desk agents that he had a neuromuscular disease called Dystonia. He was told that this would allow future airline agents to quickly recognize that Gates was able to fly unaccompanied and provide him the reasonable assistance required, despite the appearance caused by his disability.

22.     On June 6, 2007, Gates and his mother arrived at the Jacksonville International Airport scheduled to depart Jacksonville on U.S. Airways Flight 1618 at 1:40 p.m.

23.     Upon arrival, Gates checked his luggage and informed the U.S. Airways' desk agent that he had Dystonia, a neuromuscular disease which caused intermittent muscle spasms.

24.     Gates was informed that a U.S. Airways shift manager would meet him at the boarding gate to provide any assistance needed in the boarding process.

25.     Gates' mother accompanied him through security and to Gate B8, where Flight 1618 was scheduled to depart.

26.     Prior to boarding, Gates went to the restroom and, upon exit, was approached by U.S. Airways shift manager Saadiq.

27.     Saadiq informed Gates that he would not be able to fly unless he was accompanied by an individual that was not disabled.

28.     Gates informed Saadiq that he had informed the U.S. Airways ticketing counter of his disability and that it would not pose a problem for him to travel unaccompanied.

29.     Moreover, Gates explained to Saadiq that, despite his appearance, he was more than able to fly unaccompanied and had done so on multiple occasions in the past, including with U.S. Airways.

30.     Saadiq again informed Gates that he would not be allowed to fly alone.

31.     Saadiq further informed Gates that his mother could accompany him on the flight to Milwaukee at no cost.

32.    Gates and his mother inquired as to whether she would be allowed to return the next day, so as to be back in Jacksonville in time for her surgery.

33.    Gates and his mother were informed by Saadiq that U.S. Airways could not guarantee her return on June 7, 2007, nor would they allow her to return to Jacksonville unless she purchased the return ticket from Milwaukee to Jacksonville.

34.    Gates asked repeatedly to speak to Saadiq's supervisor or Captain John Doe.

35.    Gates was denied access to any other U.S. Airways personnel, including U.S. Airways' complaint resolution official ("CRO").

36.    Gates then requested the name of Saadiq's supervisor and Captain John Doe.

37.    Saadiq refused to tender the requested information to Gates.

38.    Saadiq informed Gates that he would not be able to speak to any other U.S. Airways personnel regarding the decision made to not allow him to fly unaccompanied.

39.    Furthermore, Saadiq told Gates that the decision was made by Captain John Doe, based upon the appearance of Gates' leading him to determine that Gates was too disabled to fly unaccompanied.

40.    Gates was then informed by Saadiq that he had six (6) minutes to decide whether his mother would accompany him on the flight.

41.    Without any assurance that Gates' mother would be able to make it back to Jacksonville in time for her surgery, Gates decided to return home and seek to travel with an alternative carrier at a later time.

6

42.    Gates subsequently purchased an additional ticket through Delta Airlines for Flight 446 on June 9, 2007, from Jacksonville, Florida to Milwaukee, Wisconsin, for $452.09, approximately $151 more than Gates paid for his ticket for U.S. Airways Flight 1618.

43.    On June 9, 2007, Gates arrived at Jacksonville International Airport and informed Delta Airlines check-in personnel that he had Dystonia and would require reasonable accommodations in enplaning and deplaning.

44.    Delta provided the requested reasonable and necessary assistance to Gates in boarding his flight.

45.    Gates boarded the Delta flight with no difficulty.

46.    Gates flew from Jacksonville to Milwaukee unaccompanied.

47.    In 1986, Congress enacted and President Ronald Reagan signed into law the Air Carrier Access Act, 49 U.S.C. § 41705 ("ACAA")[1].

48.    ACAA prohibits discrimination by air carriers against people with disabilities, in order "to ensure nondiscriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers"[2].

49.    The number and types of discrimination by air carriers against passengers with disabilities are also evident in the DOT enforcement records. In September 2001, the Department of Transportation charged Northwest Airlines with several hundred violations of the Air Carrier Access Act, including instances of lengthy delays in obtaining wheelchairs, passengers being stranded aboard aircraft for extended periods,

[1] In Love v. Delta Air Lines, 310 F.3d 1347 (11th Cir. 2002), the Eleventh Circuit held that the ACAA does not grant litigants a private right of action despite the AACA being the only federal source of redress for discrimination in air travel based on disability.
[2] Air Carrier Access Act, Pub. L. No. 99-435, 100 Stat. 1080 (then codified at 49 U.S.C. § 1374 (c)(1986)).

and passengers being left at the wrong gate, resulting sometimes in the passenger missing his or her flight[3].

50.    Additionally, in 2004 and 2005, the United States Department of Transportation (the "DOT") received 957 disability-related complaints about service provided by U.S. Airways, including numerous complaints regarding the failure of U.S. Airways in properly enplaning and deplaning disabled travelers[4].

51.    Subsequent to the passing of ACAA, the DOT issued a series of regulations implementing ACAA that are codified at Title 14 CFR Part 382 (the "ACAA Regulations").

52.    14 CFR § 382.7(a), in pertinent part, provides:

A carrier shall not...

(2) Require a person with a disability to accept special services (including, but not limited to, preboarding) not requested by the passenger;

(3) Exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons, even if there are separate or different services available for persons with a disability except when specifically permitted by another section of this part.

53.    14 CFR § 382.31, in pertinent part, provides:

(a) Unless specifically permitted by a provision of this part, a carrier shall not refuse to provide transportation to a qualified individual with a disability on the basis of his or her disability.

(b) A carrier shall not refuse to provide transportation to a qualified individual with a disability solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers.

---

[3] See http://www.dot.gov/affairs/dot9001.htm. Accessed June 17, 2007.
[4] Data for 2006 unavailable from Department of Transportation at time of filing of this Complaint.

54.    14 CFR § 382.39, in pertinent part, provides:

Carriers shall ensure that qualified individuals with a disability are provided the following services and equipment:

(a) Carriers shall provide assistance requested by or on behalf of qualified individuals with a disability, or offered by air carrier personnel and accepted by qualified individuals with a disability, in enplaning and deplaning. The delivering carrier shall be responsible for assistance in making flight connections and transportation between gates.

(1) This assistance shall include, as needed, the services personnel and the use of ground wheelchairs, boarding wheelchairs, on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.

\*    \*    \*    \*

(b) Carriers shall provide services within the aircraft cabin as requested by or on behalf of individuals with a disability, or when offered by air carrier personnel and accepted by individuals with a disability as follows:

(1) Assistance in moving to and from seats, as part of the enplaning and deplaning processes.

55.    14 CFR § 382.61, in pertinent part, provides:

Each carrier which operates aircraft with more than 19 passenger seats shall provide training, meeting the requirements of this paragraph, for all its personnel who deal with the traveling public, as appropriate to the duties of each employee.

(1) The carrier shall ensure training to proficiency concerning:

(i) The requirements of this part and other DOT or FAA regulations affecting the provision of air travel to persons with a disability; and

\*    \*    \*    \*

(2) The carrier shall also train such employees with respect to awareness and appropriate responses to persons with a disability, including persons with physical, sensory, mental, and emotional disabilities, including how to distinguish among the differing abilities of individuals with a disability.

56. 14 CFR § 382.65(a). In pertinent part, provides, "[e]ach carrier providing scheduled service shall establish and implement a complaint resolution mechanism, including designating one or more complaints resolution official(s) (CRO) to be available at each airport which the carrier serves."

57. Additionally, U.S. Airways' Corporate Website provides the following information, in pertinent part, to disabled travelers:

> Inform the ticketing agent of any special assistance you may need…If you need extra time to board the aircraft or assistance transferring from a wheelchair to an aisle seat, please inform a US Airways gate agent or flight attendant. Special boarding chairs are available to assist physically challenged passengers to their seats. Remember to provide clear instructions to personnel regarding how you wish to be lifted.

*See* http://www.usairways.com/awa/content/traveltools/specialneeds/mobility.aspx. Accessed June 11, 2007.

58. At all times material hereto, Gates was a qualified individual with a disability that limited a major life activity, pursuant to AACA Regulations.

59. At all times material hereto, Defendants failed to provide any assistance to Gates in enplaning and deplaning U.S. Airways Flight 1618.

60. Gates was never asked by Defendants how his disability generally affected him.

61. Gates was never asked by Defendants what assistance, if any, his disability would require while enplaning and deplaning.

62. Gates was never asked by Defendants if he could assist himself from the aircraft in the event of emergency.

63. Defendants failed to provide Gates access to a U.S. Airways CRO.

64.     U.S. Airways failed to train its employees, including but not limited to Saadiq, John Does, and Captain John Doe, with respect to awareness and appropriate response to persons with a disability, including how to distinguish among the differing abilities of individuals with a disability.

65.     Defendants failed to ask any questions or conduct any investigation as to whether Gates was capable of complying with the reasonable safety requests of U.S. Airways personnel.

66.     Defendants sought to require Gates to accept special services that he did not request, namely flying accompanied by his mother, in order to board U.S. Airways Flight 1618.

67.     Defendants made a decision as to Gates' suitability to fly unaccompanied, based solely on his appearance and disability, without conducting any due diligence relevant to the same, and Defendants' decision to not allow Gates to fly unaccompanied was based solely on Gates' appearance and involuntary behavior which offended, annoyed, and inconvenienced Defendants.

68.     During the events of June 6, 2007, Gates was subject to constant attention, scrutiny and embarrassment above and beyond the standard attention drawn as a result of his appearance and disability.

69.     As a result of Defendants' intentional and per se discrimination, Gates has endured emotional distress, humiliation, embarrassment, mental pain, suffering, inconvenience, and financial injury.

70.     Defendants' actions were intentional, malicious, willful, wanton, and callous, and showed reckless disregard for Gates' civil and constitutional rights.

COUNT I - BREACH OF CONTRACT OR, IN THE ALTERNATIVE, BREACH OF
IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

71.     Gates hereby reasserts by reference in this Count I the allegations of
Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72.     On or about May 20, 2007, Gates and U.S. Airways entered into an
agreement whereby Gates would purchase a ticket for Two Hundred Ninety-Five and
10/100 Dollars ($295.10) in exchange for U.S. Airways providing Gates passage on U.S.
Airways Flight 1618 from Jacksonville, Florida to Milwaukee, Wisconsin on June 6,
2007 (collectively the "Agreement").

73.     U.S. Airways breached the terms of the Agreement, by virtue of their
conduct described hereinabove, particularly, U.S. Airways refused to allow Gates to
board Flight 1618 and travel from Jacksonville, FL to Milwaukee, WI because of his
disability.

74.     As a direct and proximate result of U.S. Airways' breach of the
Agreement or, in the alternative, U.S. Airways' breach of the implied covenants of good
faith and fair dealing with respect to the Agreement, Gates has suffered and will continue
to suffer irreparable injury and economic losses all to Gates' damage in an amount to be
proven at time of trial.

COUNT II - NEGLIGENT MISREPRESENTATION

75.     Gates hereby reasserts by reference in this Count II the allegations of
Paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.     U.S. Airways negligently made false representations of material facts
concerning the Agreement and Flight 1618, particularly, U.S. Airways failed to disclose
that Gates would be prohibited from boarding or traveling on Flight 1618 due solely to

his disability; U.S. Airways failed to disclose that they would not provide the reasonable and necessary assistance to Gates in boarding his flight; and U.S. Airways failed to disclose that they would not provide the represented special assistance to Gates in enplaning and deplaning Flight 1618[5].

77.      Gates, to his detriment, relied upon the false representations of material facts concerning the Agreement and Flight 1618 made by U.S. Airways, and based upon such reliance, entered into the Agreement.

78.      As a direct and proximate result of the aforementioned negligent misrepresentations, Gates suffered damages in that Gates had to incur unexpected costs traveling home, purchasing additional travel at an increased cost, traveling back to Jacksonville International Airport, and was not reimbursed fully for U.S. Airways' failure to perform under the Agreement.

79.      U.S. Airways fraudulently induced Gates into purchasing a ticket for Flight 1618 and entering into the Agreement, and, but for the fraud, Gates would not have purchased a ticket for passage on Flight 1618.

80.      As a direct and proximate result of U.S. Airways' negligent misrepresentation, Gates has suffered and will continue to suffer irreparable injury and economic losses all to Gates' damage in an amount to be proven at time of trial.

## COUNT III – INTENTIONAL MISREPRESENTATION

81.      Gates hereby reasserts by reference in this Count III the allegations of Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82.      U.S. Airways intentionally made false representations of material facts concerning the Agreement and Flight 1618, particularly, U.S. Airways failed to disclose

---

[5] *See* http://www.usairways.com/awa/content/traveltools/specialneeds/mobility.aspx.

that Gates would be prohibited from boarding or traveling on Flight 1618 due solely to his disability and in violation of the AACA; Defendants failed to disclose that they would not provide the reasonable and necessary assistance to Gates in boarding his flight; and U.S. Airways failed to disclose that they would not provide the represented special assistance to Gates in enplaning and deplaning Flight 1618[6].

83.     Gates, to his detriment, relied upon the false representations of material facts concerning the Agreement and Flight 1618 made by U.S. Airways, and based upon such reliance, entered into the Agreement.

84.     As a direct and proximate result of the aforementioned intentional misrepresentations, Gates suffered damages in that Gates had to incur unexpected costs traveling home, purchasing additional travel at an increased cost, traveling back to Jacksonville International Airport, and was not reimbursed fully for U.S. Airways' failure to perform under the Agreement.

85.     U.S. Airways fraudulently induced Gates into purchasing a ticket for Flight 1618 and entering into the Agreement, and, but for the fraud, Gates would not have purchased a ticket for passage on Flight 1618.

86.     As a direct and proximate result of U.S. Airways' negligent misrepresentation, Gates has been injured and seeks damages in an amount of $10,000.00.

87.     Moreover, U.S. Airways' actions and conduct aforesaid were done willfully, intentionally, maliciously and without regards for the rights of Gates, and Gates, pursuant to Florida Statutes § 768.72, accordingly seeks punitive damages in an amount equal to $1,000,000.00.

ttent/traveltools/specialneeds/mobility.aspx.

14

## COUNT IV - DECEPTIVE AND UNFAIR TRADE PRACTICES

88.    Gates hereby reasserts by reference in this Count IV the allegations of Paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.    The Defendants have violated the Florida Deceptive and Unfair Trade Practices Act. Fla. Stat. Ch. 501.201 et seq. (the "FDUTPA"), by virtue of their conduct described hereinabove, particularly, the Defendants: (i) advertised that their services would conform with the ACAA; and (ii) advertised services to disabled travelers, particularly, they advised Gates to:

> Inform the ticketing agent of any special assistance you may need...If you need extra time to board the aircraft or assistance transferring from a wheelchair to an aisle seat, please inform a US Airways gate agent or flight attendant. Special boarding chairs are available to assist physically challenged passengers to their seats. Remember to provide clear instructions to personnel regarding how you wish to be lifted.

*See* http://www.usairways.com/awa/content/traveltools/specialneeds/mobility.aspx.

90.    The Defendants failed to provide any of the aforementioned advertised services.

91.    The Defendants aforementioned conduct is an unfair and deceptive trade practice pursuant to the FDUTPA, in that it was a representation likely to mislead Gates to his detriment.

92.    Moreover, the Defendants' conduct is unconscionable under the FDUTPA.

93.    Gates has suffered actual injury due to the Defendants' violation of the FDUTPA, as Gates incurred unexpected costs traveling home, purchasing additional travel at an increased cost, traveling back to Jacksonville International Airport, and was

not reimbursed fully for U.S. Airways' failure to perform under the Agreement, all as a result of the ongoing deceptive trade practices of the Defendants.

94.   As a direct and proximate result of Defendants violation of the FDUTPA, Gates has suffered and will continue to suffer irreparable injury and economic losses all to Gates' damage in an amount to be proven at time of trial.

95.   Gates has employed his undersigned attorneys and is obligated to pay them a reasonable fee.

## COUNT V – VIOLATION OF FLORIDA CONSTITUTION, ART. I, § 2

96.   Gates hereby reasserts by reference in this Count V the allegations of Paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.   Defendants, by virtue of their conduct described hereinabove, violated Gates' rights and privileges as guaranteed to him under the Constitution of the State of Florida, Article I, Section 2.

98.   On June 6, 2007, Defendants engaged in intentional discrimination based on Gates' disability by purposely denying him boarding and passage on Flight 1618.

99.   As a direct and proximate result of the aforementioned wrongful acts by Defendants, Gates suffered and will continue to suffer humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to his reputation, and economic losses, all to Gates' damage in an amount to be proven at time of trial.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

100.   Gates hereby reasserts by reference in this Count VI the allegations of Paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101. On June 6, 2007, Defendants acted intentionally and/or recklessly, by virtue of their outrageous conduct described hereinabove, particularly, when they denied Gates boarding and travel on Flight 1618 due solely to his disability, and failed to provide him access to Saadiq's supervisor or a CRO.

102. Defendants should have known that their discriminatory treatment of Gates would create a reasonable risk of emotional and physical damage, and did in fact cause emotional distress.

103. As a direct and proximate result of the aforementioned wrongful acts committed by Defendants, Gates suffered and will continue to suffer emotional distress, humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to his reputation and economic losses, all to Plaintiffs' damage in an amount to be proven at time of trial.

104. Moreover, U.S. Airways' actions and conduct aforesaid were done willfully, intentionally, maliciously, recklessly and without regards for the rights of Gates, and Gates, pursuant to Florida Statutes § 768.72, accordingly seeks punitive damages in an amount equal to $1,000,000.00.

## COUNT VII – DEFAMATION

105. Gates hereby reasserts by reference in this Count VII the allegations of Paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106. Defendants intentionally and/or recklessly made statements that were false and defamatory *per se* against Gates regarding their reasons for denying Gates boarding and travel on Flight 1618.

17

107.   Defendants intentionally and falsely proclaimed that Gates was too disabled to fly unaccompanied.

108.   Defendants intentionally and falsely proclaimed that Gates could not board or travel on Flight 1618 unaccompanied.

109.   The aforementioned false and defamatory statements against Gates were proclaimed in the presence of third-parties including, but not limited to, Patsy Gates and other persons located in and around Gate B8 where Gates expected to board Flight 1618.

110.   Defendants knew, or should have known in the exercise of reasonable care, that their statements were false and defamatory.

111.   These false and outrageous statements were made with the specific intent to justify Defendants discriminatory actions and cause Gates further embarrassment, humiliation, ridicule, contempt and hatred.

112.   As a direct and proximate result of the aforementioned statements made by Defendants, Gates suffered injury to his reputation and was exposed to public hatred, contempt, contempt, disgrace and ridicule.

113.   As a direct and proximate result of the aforementioned wrongful acts by Defendants, Gates suffered and will continue to suffer emotional distress, humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to his reputation, and economic losses, all to Plaintiffs' damage in an amount to be proven at time of trial.

114.   Moreover, Defendants' actions and conduct aforesaid were done willfully, intentionally, maliciously and without regards for the rights of Gates, and Gates, pursuant

18

to Florida Statutes § 768.72, accordingly seeks punitive damages in an amount equal to $1,000,000.00.

## COUNT VIII – NEGLIGENT HIRING; TRAINING; AND/OR SUPERVISION

115.   Gates hereby reasserts by reference in this Count VIII the allegations of Paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116.   U.S. Airways is responsible for the hiring, training, instruction, supervision, and discipline of U.S. Airways' agents, employees, and/or representatives who were at all times relevant acting within the scope of their employment.

117.   Upon information and belief, U.S. Airways was grossly negligent in its hiring, training, instruction, supervision, and discipline U.S. Airways' agents, employees, and/or representatives, particularly with respect to Saadiq, Captain John Doe, and John Does.

118.   U.S. Airways had a duty to train its employees with respect to awareness and appropriate responses to persons with a disability, including persons with physical, sensory, mental, and emotional disabilities, including how to distinguish among the differing abilities of individuals with a disability pursuant to AACA and AACA Regulations.

119.   U.S. Airways' negligent hiring, training, supervision, and discipline of its employees, agents and/or representatives, particularly with respect to Saadiq, Captain John Doe, and John Does subjected Gates to intentional discrimination on the basis of his disability.

19

120.    Defendants' acts of intentional discrimination caused Gates to be unlawfully denied boarding and travel on Flight 1618, and caused him to be prevented from being provided access to Saadiq's supervisor or a CRO.

121.    As a consequence of U.S. Airways' negligent hiring, training, supervision, and discipline of its employees, agents and/or representatives, Gates suffered and will continue to suffer humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to his reputation, and economic losses, all to Plaintiffs' damage in an amount to be proven at time of trial.

WHEREFORE, the plaintiff, John A. Gates, requests the following:

1.    Entry of a judgment in his favor and against Defendants for his damages, together with interest, costs and reasonable attorney's fees resulting from:

a.    U.S. Airways' breach of contract; negligent misrepresentation; intentional misrepresentation; and negligent hiring, training, and/or supervision; and

b.    Defendants' violation of the Florida Deceptive and Unfair Trade Practices Act; violation of Art. 1, § 2 of the Florida Constitution; negligent infliction of emotional distress; and defamation;

2.    (An award of $3,000,000.00 in punitive damages for U.S. Airways' intentional misrepresentation, intentional infliction of emotional distress, and the Defendants' defamation;

20

3.      Entry of a judgment declaring that the acts of Defendants complained of herein violate the Florida Deceptive and Unfair Trade Practices Act, pursuant to Fla. Stat. § 501.211(1);

4.      Entry of an order, pursuant to Fla. Stat. § 501.211(1), permanently enjoining the Defendants from further committing the acts complained of herein and in violation of the Florida Deceptive and Unfair Trade Practices Act;

5.      That a jury be empaneled to hear this cause; and

6.      For such other and further relief to which Gates may be entitled.

Dated August 15th, 2007.

JOHN A. GATES,

By: Counsel

Counsel:

Aaron C. Bates, Esq.
Goldberg Bates, PLLC
Florida Bar No. 011749
3660 Maguire Boulevard
Suite 102
Orlando, FL 32803
Telephone: (407) 893-3776
Facsimile: (407) 893-3779
abates@goldbergbates.com

21